## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

OCCUPY JACKSONVILLE,
ZACHARY ADDAIR, ETHAN
BOX, and KRISTIAN GORE,

           Plaintiffs,

vs.                                 Case No. 3:11-cv-01264-J-37MCR

CITY OF JACKSONVILLE,

           Defendant.

_____

### ORDER

This cause is before the Court on the following:

1.     The Court's Order to Show Cause (Doc. No. 24), entered on March 12, 2012;

2.     Unopposed Motion to Amend Complaint with Incorporated Memorandum of Law (Doc. No. 25), filed on March 15, 2012;

3.     Statement of Cause Regarding Justiciability (Doc. No. 26), filed on March 15, 2012; and

4.     Defendant, the City of Jacksonville's, Response in Opposition to Plaintiffs' Motion to Amend Complaint (Doc. 25) and "Statement of Cause Regarding Justiciability" (Doc. 26) (Doc. No. 27), filed on March 21, 2012.

### BACKGROUND

Occupy Jacksonville ("Occupy"), Zachary Addair, Ethan Box, and Kristian Gore (collectively, "Plaintiffs") filed this action on December 27, 2011.  Plaintiffs seek declaratory

relief, injunctive relief, and compensatory damages pursuant to 42 U.S.C. § 1983 for "ongoing and threatened injury to the First, Fourth, and Fifth Amendment rights of individuals and an unincorporated association engaged in lawful expressive activity within the City of Jacksonville, Florida." (*Id.* at ¶ 1.)  They assert facial challenges against the constitutionality of several provisions of the Ordinance Code of the City of Jacksonville, Florida ("Code"). (*Id.* at ¶ 3.)  Plaintiffs also challenge the Code's application to their demonstrations outside City Hall and the use of the City's police powers to "suppress, squelch or chill" their "rights to political expression and to petition the government for redress of grievances." (*Id.*)

## A.    The Occupy Jacksonville Movement

Occupy is a "grassroots, local organization formed in solidarity with the Occupy Wall Street movement." *See Occupy Jacksonville Announces the End of the 24-7 Occupation,* http://occupy-jax.org/news (last visited Apr. 13, 2012).  Plaintiffs describe the group as an "unincorporated association[1] of individuals" who are "imminently concerned about the current status of the country's political and economic system" and direction who have "spontaneously gathered to bring visibility to the institutional corruption of the political system, namely the influence of private money on the political system and process at all levels of government." (*See* Doc. No. 1, ¶ 13.)  The coalition's "core purpose" is "to bring awareness to and foster the tools for education and change to address its concerns about the U.S. political process and economic policies through symbolic 'occupation' of public space." (*Id.*)

---

[1]  The Court uses the terms "association," "group," "coalition," and other similar terms interchangeably when describing Occupy throughout this Order.

On or about November 5, 2011,[2] Occupy began "an around-the-clock vigil outside of City Hall."  (*Id.* at ¶ 15.)  They maintained a continuous 24-hour, 7-day-a-week ("24/7") presence on the sidewalk in front of Jacksonville's City Hall.  Occupy's members sat in folding chairs on the sidewalk, held and displayed handmade signs and posters, sometimes wrote messages in chalk on the sidewalk,  and at times played loud music. (*See* Doc. No. 27, p. 2.)  The group also erected "literature displays" on long tables they brought to the protest site, and kept large, plastic storage containers, tarps, and other miscellaneous items at the site.  (*See id.*)

"During the first few days of the vigil, deputies of the Jacksonville Sheriff's Office ("JSO") distributed to protestors a copy of Code Section 614.138 with the definition of camping and the prohibition against sleeping, camping, lodging, or lying in public emphasized." (Doc. No. 1, ¶ 17.)   Although protestors "had not been sleeping on site," they were keeping "literature" in a tent to protect it "from the elements" and made "coffee and tea at the protest site."  (*Id.*)   After the JSO presented them with copies of the ordinance, they removed the tent and stopped making tea and coffee.  (*See id.*)

## B.    The Demand Letter

On December 22, 2011, the City's Deputy General Counsel, Howard M. Multz, "hand-delivered" a letter (the "Demand Letter") to the protest site.  (*Id.* at ¶ 19; *id.* at p. 11.) The Demand Letter informed Occupy that protest signs displayed  "in the right of way or

---

[2]   In Plaintiffs' proposed First Amended Complaint, which they filed with their Unopposed Motion to Amend Complaint with Incorporated Memorandum of Law, Plaintiffs allege that  since October 8, 2011 Occupy, had been holding" protest marches and vigils, educational assemblies, flower planting, and other protests outside of City Hall and elsewhere . . . ." (Doc. No. 25-1, ¶ 16.)  This one month difference is immaterial to the issues at hand.

on city property [would be] subject to confiscation and the owner of such signs [would be] subject to civil sanctions and/or other enforcement." (*Id.* at ¶ 20; *id.* at p. 11.) The letter also informed the protestors that the items they were storing on the sidewalk in front of City Hall created a safety hazard and violated Section 614.138 of the Code. (*Id.* at p. 11.)

After receiving the Demand Letter, Plaintiffs filed their Complaint (Doc. No. 1), a Motion for Temporary Restraining Order (Doc. No. 2), and an Emergency Motion for Preliminary Injunction and Request for Expedited Hearing (Doc. No. 3) on December 27, 2011. Later that day, the City of Jacksonville's General Counsel, Cindy A. Laquidara, sent Occupy's counsel a letter in which she "clarified" an "apparent misunderstanding" between Occupy and the City "with regard to the Demand Letter." (Doc. No. 22, p. 5.) She informed Plaintiffs that the City "had no immediate intention to remove signs or personal belongings from the front of City Hall and had intended merely to notify Occupy . . . that enforcement procedure would begin." *Id.*

C.      **The January 19th Letter**

A few weeks later, on January 19, 2012, Ms. Laquidara sent Plaintiffs a more comprehensive letter, addressing the allegations in their Complaint (the "January 19th Letter"). (*See* Doc. No. 22, pp. 6-7.) She informed them that Section 656.1333(k) was inapplicable to their conduct, and that "if a sign would be legal [under Section 656.1315] if it were a business sign, then it would be considered legal regardless of the content of its message so long as the message was protected First Amendment speech, (i.e., not, for example, obscene)." (*See* Doc. No. 22, pp. 6-7.)

The City did, however, continue to consider Occupy to be in violation of Section 614.138 of the Code, which prohibits "camping in the designated 'Urban Core

4

Enhancement Area,' " in which City Hall is located.  (*Id.* at p. 6.)  The letter stated that Plaintiffs were "violating this ordinance, as would any group delivering any message irrespective of their viewpoint should that group sleep, camp, lodge, or lie on public property." (*Id.*)

### D.    The End of the 24/7 Protest

On Saturday, March 3, 2012, Occupy voluntarily ended its 24/7 protest.  (*Id.* at Ex. A.)[3]  According to the most recent posting in the "News" Section of the Occupy website, "[t]he decision [to end the occupation] was reached at the General Assembly held on Saturday, March 3rd, **as an overwhelming majority of Occupy Jacksonville members felt that it was time for Occupy Jacksonville to evolve to a new stage** in [the] struggle for political, social and economic justice."  *See* Occupy Jacksonville Announces the End of the 24-7 Occupation, http://occupy-jax.org/news (last visited Apr. 13, 2012) (emphasis added).

On March 12, 2012, after learning that the protesters were no longer present outside City Hall and that Occupy had decided to cease its "occupation" of the sidewalk, the Court entered an Order *sua sponte,* directing Plaintiffs to show cause why this action should not be dismissed for lack of a case or controversy.  (Doc. No. 24.)  They responded on March 15, 2012, arguing that a case or controversy remains despite their decision to cease the 24/7 protest.  Plaintiffs also filed a Motion to Amend Complaint (Doc. No. 25) at that time.[4]

---

[3]  This information is also available on Occupy's website: Occupy Jacksonville, http://occupy-jax.org/content/occupy-jacksonville-announces-end-24-7-occupation  (last visited April 13, 2012).

[4]  Although the motion was originally "unopposed," the City filed a Response (Doc. No. 27), in which it stated, "While Plaintiffs title their Motion to Amend Complaint as 'Unopposed,' this is not accurate at this stage of the proceedings." (Doc. No. 27, p. 1 n.1.)

Shortly thereafter, the City filed its Response to the Motion to Amend (Doc. No. 27), in which it asserts that there is no longer a justiciable case or controversy ripe for judicial review.

## APPLICABLE LAW

"Standing and ripeness present the threshold jurisdictional question of whether a court may consider the merits of a dispute." *Elend v. Basham*, 471 F.3d 1199, 1204 (11th Cir. 2006) (*Elend II*). "The [ripeness doctrine] deals with when a party can seek pre-enforcement review: 'whether there is sufficient injury to meet Article III's requirement of a case or controversy and, if so, whether the claim is sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decision-making by the court.' " *Id.* at 1210-11 (citing *Digital Props., Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997) (quoting *Cheffer v. Reno*, 55 F.3d 1517, 1524 (11th Cir. 1995)). The issue of ripeness originates from the Constitution's Article III requirement that in order for a federal court to have jurisdiction to hear a case, there must exist an actual case or controversy. *Id.* at 1204-05; Constitution Art. III, § 2, cl. 1. This jurisdictional limitation "defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded." *Allen v. Wright*, 468 U.S. 737, 750 (1984). For federal subject matter jurisdiction to exist, a real case or controversy must exist throughout the litigation. *Chiles v. Thornburgh*, 865 F.2d 1197, 1202 (11th Cir. 1989).

A justiciable controversy "must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy

---

The City opposes the motion because "subsequent events – namely, the Plaintiffs voluntarily abandoning their protest in front of City Hall – have resulted in there being no further justiciable issues in this case." (*Id.*)

admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. of Hartford, Connecticut v. Haworth*, 300 U.S. 227, 240-41 (1937) (citations omitted).   To determine whether an anticipatory challenge to government action is justiciable, the court must ask "whether the plaintiff is seriously interested in disobeying, and the defendant is seriously intent on enforcing the challenged measure." *Int'l Soc. for Krishna Consciousness of Atl. v. Eaves*, 601 F.2d 809, 818 (5th Cir. 1979).  "Federal courts lack subject matter jurisdiction where intervening events in an action render the claims moot."  *United States v. DeKalb Cnty., Ga.,* No. 1:10–cv–403, 2011 WL 6369569, at *5 (N.D. Ga. Oct. 11, 2011) (citing *United States v. Shenberg*, 90 F.3d 438, 440 (11th Cir.1996)).

## DISCUSSION

### A.   Plaintiffs' Intent to Continue Protesting

Plaintiffs claim this action remains justiciable because they "have announced an intent to continue protesting, and the City has announced its intent to enforce the Code to bar Plaintiffs' use of signs and other expressive displays."  (Doc. No. 26, ¶¶ 10, 11.) Despite this assertion, however,  it is undisputed that Occupy "voluntarily" ended its 24/7 protest because "an overwhelming majority of Occupy Jacksonville members felt that it was time for Occupy Jacksonville to evolve to a new stage in [the] struggle for political, social and economic justice."   *See* Occupy Jacksonville Announces the End of the 24-7 Occupation, http://occupy-jax.org/news (last visited Apr. 13, 2012).  Additionally, in the group's public statement regarding their decision to stop the City Hall occupation, they "thank[ed] the Jacksonville Sheriff's Office for the professionalism displayed by the officers

7

throughout the Occupation" and expressed gratitude "for the generosity of the downtown merchants who supported [their] movement." *See id.* In light of these facts, and because there is no evidence that the group intends to begin another 24/7 occupation in the ascertainable future, the Court finds Occupy's statement that it intends to continue protesting insufficient to show that the claims alleged in its Complaint (Doc. No. 1) and its proposed First Amended Complaint (Doc. No. 25-1) are "justiciable."

"Ripeness analysis involves the evaluation of two factors: the hardship that a plaintiff might suffer without court redress and the fitness of the case for judicial decision." *Elend II*, 471 F.3d at 1211. The claims in Occupy's Complaint (Doc. No. 1) and proposed First Amended Complaint (Doc. No. 25-1) are based on the group's unique 24/7 presence on the sidewalk outside of City Hall. Now that they have completely vacated the sidewalk, the only ordinance that they were allegedly violating, Section 614.138, is inapplicable. If the Court were to determine whether "storage of [Plaintiff's] items at their protest site," violated this ordinance or any "unwritten laws," such an opinion would be merely advisory now that Occupy's "protest site" no longer exists. (*See* Doc. No. 25-1, p. 11.) Because the Constitution prohibits this Court from issuing advisory opinions, it is clear that this case is not "fit" for judicial decision. *See Elend II*, 471 F.3d at 1211.

Moreover, although the hardship element of the ripeness analysis "can sometimes be established if a plaintiff demonstrates that he would have to choose between violating an allegedly unconstitutional statute or regulation and risking criminal or severe sanctions," a plaintiff attempting to establish hardship this way must demonstrate that "a credible threat of prosecution" exists. *Elend II,* 471 F.3d at 1211 (citing *Steffel v. Thompson,* 415 U.S. 452, 462 (1975); *Babbit v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979)). Here, the

evidence shows that Plaintiffs did not cease their 24/7 occupation because they were forced to choose between violating a City ordinance or "risking criminal or severe sanctions," but rather because they wanted to move on to a new "stage." *See* Occupy Jacksonville Announces the End of the 24-7 Occupation, http://occupy-jax.org/news (last visited Apr. 13, 2012).

Indeed, the fact that Plaintiffs decided to cease their occupation shortly before this Court had the opportunity to hear them on their Motion for Preliminary Injunction (Doc. No. 3) serves as a further indication that the group's decision was voluntary.  If any of the new "stages" were to  involve conduct similar to that which prompted them to file this suit, it is likely that they would not have stopped the occupation in front of City Hall until the Court determined whether to temporarily enjoin the City from enforcing the ordinances allegedly at issue.  The record does not contain any evidence that Occupy's plans for future protests will involve a 24/7 presence on city owned property.  Additionally, the City maintains that Occupy is no longer violating any ordinances now that they have stopped "occupying" the sidewalk.  (*See* Doc. No. 27, p. 11.)[5]  Therefore, the Court finds that no "credible threat of prosecution" exists.  Plaintiffs have not shown that either element of the "ripeness" analysis weighs in their favor.

### B.      Prior Seizure of a Sign

Occupy also asserts that this dispute remains ripe for disposition because, on January 24, 2012, two JSO deputies "pulled a protest sign from under a table maintained by Plaintiffs and confiscated it, without prior notice, warrant, court order, or any other legal

---

[5]  It is worth noting that Occupy continues to hold "General Assembly" meetings on Wednesdays and Saturdays, and there is no evidence that the City has attempted to "squelch" such meetings or that it has interfered with any of Occupy's other activities.

process." (Doc. No. 26, ¶ 3.) They argue that the City's "threat to confiscate signs and displays, *which it has already carried out*, puts Plaintiffs in substantial doubt of their ability to exercise their First Amendment rights without unconstitutional interference . . . ." (*Id.* at ¶ 7 (emphasis in original).)

Even assuming without deciding that JSO's confiscation of the sign violated the Plaintiffs' First Amendment rights, this issue no longer presents a justiciable issue. The City represented to the Court that "Occupy asked that [the] sign be returned, and the City has informed the group that it will return the sign." (Doc. No. 27, p. 4.) With no evidence from which this Court can infer that the City will not return the sign, nor any support for Occupy's contention that "[t]his seizure leaves no doubt of the City's intent to carry out its December 22, 2011 threat to confiscate signs and materials,"[6] the Court finds this isolated example insufficient to show that a "live" case or controversy remains in this action.

### C.    "Slamming the Courthouse Door"

Finally, the Court turns to Occupy's assertion that "[f]or the Court to slam the courthouse door in the faces of protestors merely because seven weeks have passed since the City of Jacksonville has seized a protest sign would be a grave injustice." (*Id.* at ¶ 11.) In making this assertion, Occupy seemingly disregards the jurisdictional constraints on this Court that are outlined in the very Constitution that grants them their First Amendment freedoms. *See Elend II*, 471 F.3d at 1204 (citations omitted). As stated above, only litigants with justiciable cases and controversies may gain entry through the "courthouse door," and may retain access once inside. Whether the City of Jacksonville

---

[6]   The record also lacks any evidence indicating whether there remain any such signs or materials or where or when the City might confiscate them.

seized a protest sign seven weeks ago or seven minutes ago is of no consequence in the Court's determination as to whether any justiciable issues remain in this action. What is important, however, is the fact that the group has voluntarily stopped engaging in the conduct that created a case and controversy in this matter.

The controversy that prompted Plaintiffs to file suit must be "live" throughout the case; "federal jurisdiction is not created by a previously existing dispute." *See U.S. Fire Ins. Co. v. Caulkins Indiantown Citrus Co.*, 931 F.2d 744, 747 (11th Cir. 1991) (citing *Chiles*, 865 F.2d at 1202)). "Ripeness is peculiarly a question of timing. Its basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Little v. Strange*, 796 F. Supp. 2d 1314, 1333-34 (M.D. Ala. 2011) (citing *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985) (citations and alterations omitted)). Although the issues in this case may have been ripe for adjudication when the matter was filed, the passage of time and "intervening events" have rendered the claims moot. *See DeKalb Cnty.*, 2011 WL 6369569, at *5. As such, the Court lacks jurisdiction over this action.

## CONCLUSION

Based on the current record, Plaintiffs' claims are not fit for judicial decision because "[i]t would strain credulity to say that there is a credible threat that Plaintiffs' First Amendment rights will be violated in the future." *Elend v. Sun Dome, Inc.,* 370 F. Supp. 2d 1206,1212 (M.D. Fla. 2006) (*Elend I*). Although Occupy asserts that they intend to continue protesting, the Court does not know when they will protest, where they will protest, or how they will protest. This uncertainty, paired with Occupy's public statements and voluntary decision to stop the 24/7 protest before this Court heard argument on their

Motion for Preliminary Injunction (Doc. No. 3), lead the Court to conclude that no "live" case and controversy remains.

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1. Plaintiffs' Complaint (Doc. No. 1) is **DISMISSED WITHOUT PREJUDICE**.

2. The Court's Order to Show Cause (Doc. No. 24) is **DISCHARGED** and any pending motions are **DENIED** as moot.

3. The clerk is **DIRECTED** to close this file.

DONE AND ORDERED in Chambers in Jacksonville, Florida, on April 16, 2012.

ROY B. DALTON, JR.
United States District Judge

Copies:
Counsel of Record

12